Alright, our TTP LLC v. Orix Real Estate Capital, Inc.  Alright, our TTP LLC v. Orix Real Estate Capital, Inc. Good morning, Your Honors. I'm Paula Jacoby, and I am here today on behalf of our clients, RTP, who was the capital B borrower under a loan transaction, and Inheritance Capital, who was the guarantor under a contingent guarantee, where there was no liability under the guarantee when signed, only if there were certain triggering events that happened. We're seeking reversal because at all times, Orix, who was the lender in this case, got the full benefit of its bargain. It made a non-recourse loan, and it had all of the protections that it wanted for its non-recourse loan were in that document. To give you a little background, Your Honors. Well, let me ask you this question. The theory that the district court accepted was that the documents supporting this loan specified certain events of default, which would trigger a cash trap event, and if there was a cash trap event, then Orix was entitled to seize the rental payments provided by the tenant of this North Carolina property. And there's a lot of discussion about various things that were cash trap events, but it's my understanding of the case that it actually only took one. If there was one cash trap event, then what Orix did was all right, and so you've got to knock them all out before you can prevail. Your Honor, respectfully, that is not correct with respect to inheritance. With respect to inheritance, let's stick with with RTP for the inheritance, which is on the guarantee, and there's other language that we might want to talk about there, but for RTP, for instance, I don't understand why when from September of 2010 until several years later, their registration to do business in North Carolina was revoked. Why that wasn't an event of default? Your Honor, Article 7, which sets forth the events of default, and it's 7.1C, with respect to a representation that was truthful at the time of the loan, but something happened and it was no longer true. Notice had to be given and a time to cure. But you didn't make that argument anywhere in the district court. I've looked very carefully. Your Honor, I know that we did talk about notice that there was no notice until... I don't see where you said, as a matter of this contract, the reason an event of default shouldn't have been declared was because the notice and opportunity to cure steps were not undertaken. Where is that? Your Honor, I cannot, as I stand here, remember where in the two briefs that we filed we were doing a, as you know, this came up on a summary judgment motion, and it was Oryx who filed summary judgment, and I know it is in our response brief, but Your Honor, I would be happy to submit that later exactly where it is. However, Your Honor, in terms of that particular breach, it was required that there be notice and attendee to cure, and as was done... And how could they cure during the period of time that the Secretary of State had revoked the registration to do business? That was just a fact, and they were supposed to have such a registration during the entire case. Yes, it was a representation, and there was, as you know, because the authorization to do business when it is reinstated, as it is in all states, it becomes retroactive as if there never was any not period when they were not registered. But the fact is there was a period during, I mean this is only one of many things, but there was a significant period. Whether the North Carolina Secretary of State is willing to forgive it isn't the same question as whether there was a lack of compliance under these loan agreements, and on top of that, I don't see anywhere that RTP notified Oryx that any of this problem was going on. No, Your Honor, I admit... Name changes go, you know, all sorts of things. Business structures get changed even though the agreement seems to make them a requirement of the agreement. It's a lot strange. Well, Your Honor, I can, if I may, you are correct, there wasn't notice given. We don't know why, but I do know that it was not germane to the bargain that was struck here. Why do you know that when it was in the language of the agreement? Because the key things that were in the agreement, that which protects on a non-recourse loan and that which was bargained for, was that you have Oryx having control of the money, which it did. It had a blocked account. That was in the agreement. At all times during this loan, all the money went into that locked account. But you're, I mean, I guess, you know, that may be your personal opinion, but if the agreement has specified certain things, we normally begin with the language of an agreement and we don't second-guess why the parties put it in or didn't put it in. I'm not going to disagree with Your Honor. Look at the language of the agreement. We can see from the language of the agreement the bargain that was struck. There were many elements where they said there were events of default that are nowhere in the agreement. The language isn't there. And if I may, Your Honor, look to, I know you said we'd get to inheritance later, but if this court were to find, as the court did below, that there was an event of default, there must be a reversal of the judgment against inheritance because it did not create a 30 million dollar liability against inheritance. And as a practical matter, Your Honor. But what do you do with Article 9.37 of the guarantee that, and also Section 7D, 9.37 says, nothing contained herein shall serve to affect, limit or waive the ability, the borrower, or any guarantor under the terms of the guarantee. And 7D says no exculpatory, non-recourse, limited recourse, or other language contained in any other loan document will prevent the lender from enforcing the guarantee. So it's like, it's saying yes, it's non-recourse, but there are events that overcome that. There are events, Your Honor, but as with all documents, you must stay within the four corners of the guarantee. I thought I was. That's part of the guarantee, that it overrides the non-recourse. Well no, Your Honor, respectfully, what it says in one, paragraph one of the guarantee, defines the guarantor's liabilities here. The guarantor here had liabilities only under two sets of circumstances. It would be liable if there were losses and expenses that were arising from specific defaults. And they call it BADAX because this is a non-recourse loan and it's no liability at the beginning of the case, but if something happened then you could have liability. The liability here was split off into two parts, and you have to see what the triggering event is. The triggering event that that Oryx is claiming and repeats throughout its briefs and the lower court, was that after an event of default, the RTP, the borrower here, the rents that came to them after the loan was paid, after the charges to Oryx were paid, after the taxes were paid, after the insurance was paid, that some of the money that then was under the loan agreement had to be turned over to RTP, that that money went to, was paid out to the owners of RTP. That is the specific trigger that this judgment against the guarantor was based on. Right, because it was talking about any distributions by borrower of cash or assets after an event or default. That's why they're looking at that. Except that cannot be used under Illinois law, Your Honor. Contract construction has two very established interpretive principles of provision. That is general enough to include a specific situation, which is the case here between 1A Romanet 10, which says the use of the rents generated after an event of default or cash trap for purposes other than property expenses and loan. That is a very specific trigger, and that is exactly what is pled by Oryx. That is a specific provision, and under that provision the only thing that our guarantor can be liable for, and is defined as the guarantor liabilities, is losses and expenses, if there were any. And there was no evidence presented below that there were losses or damages suffered from that is a defined term, Your Honor, in Article 1 of the guarantee, and it is not the entire debt. It is solely losses and damages as a result of that particular trigger and attorneys fees. So what work do you think all of the indebtedness and other obligations is doing? I'd just like to know your definition of that. Oh, the definition is it's any all debt, but the What were the triggering events there? A loss isn't necessarily a debt, is it? A loss is a loss. But it has to be, correct Your Honor, but a loss has to arise from the act, so Oryx, okay, an expense might be related somehow to a debt, I'm not sure, but a loss isn't necessarily a debt or other obligation. I think, Your Honor, you need to look at 1A. And, of course, there's another principle of interpretation of contracts is that you try to give meaning to everything. You don't think the parties just were just throwing words down on a piece of paper, so you want them each to mean something. I concur, Your Honor. The first principle, first of all, in terms of losses and expenses, it specifically says losses and Oryx suffered, if it did, from these excess rents that were generated after what they claimed and the court found was a default. Those rents, what was the loss that arose from that? Well, there was a million nine. That was the amount of the excess rent from 2010 when the lower court decided there was an event of the, to when Oryx imposed and started taking all of the cash. That million nine is a loss. I can, although they didn't present it that way below in the court, that is the maximum judgment that could be entered against this guarantor because that is what would arise from taking those rents generated after this Oryx's debt and paying the property expenses. That is the very narrow provision and that is what, you know, this, Your Honors, in the Seventh Circuit said in the United States versus the NLRB, the Illinois Supreme Court said in Thomas versus Gordon, you need to take when there is a general provision that's big enough to include this specific situation. And that's where I'm just having some problem. That's a very well understood proposition of law, but your argument really hinges on these, on the, on 1A being a narrower, more focused subset somehow of 1B. If it isn't, then 1B little nine, which says any distributions of cash or assets, etc., trigger inheritances liability, quote, for all of the indebtedness and other obligations. That's, that's the killer language there. That's what blows it up to the 30 million that you're, and Your Honor, understandably defending against. Well, and I can point out very easily, if I may, when you put those language side by side, even without looking at the difference of the purposes of why in one case there would only be losses and expenses, and that's when that might affect the value of the collateral versus what was under 1B, which goes to the heart where they would say if there was an insolvency, so it might be harder for them to get the property, which is their recourse for repayment. But here, they say any cash or assets. That's not what's in 1A.10. It's only rents. Obviously, there's the real estate, there's personal property. 1B is where it talks about any distributions of cash. Yes, and and why you said, why is 1B not more particular? I'm just saying, why aren't they doing something different? If they're doing something different, then there's no reason not to give 1B effect when 1B seems to be the one that applies. But 1B, Your Honor, would basically violate, if you said, yes, it is not illogical to say that 1B is large enough to include 1A.10. It also could include 1A.5, which is payment of fees. You're the one who's saying 1B includes it. I'm not the one who's saying that, or at least don't intend to be. And the only time this gets triggered is if there's been an event or default or the occurrence of a cash trap events. We can't actually avoid that issue. I understand that, Your Honor, and that's why I said since there's already been a foreclosure, the loan matured, the value of the property was foreclosed on, and there was a deficiency. So in practicality, there's nothing with respect to RTP, which is why I do focus on inheritance. And yes, we do not believe there was an event of default. However, even if there were, this judgment has to be reversed because the low was $1,000,009 in rents taken, and that is the exact trigger. And when you said, why is that more specific? It's more specific because 1A.10 only talks about rents. It does not talk about assets, other properties of real estate. It only talks about rents generated after an event of default. It does not talk about what cash was on hand or whatever. It doesn't talk about making payments of expenses. It says other types of expenses. So that is why it is more specific, and of course it's a giving out of the money. You know, rents are also an asset, right? So it could be giving out of that money, and so it would fit within 1B, but for the fact that it is more specific, and that's why the case law has said that you go to the more specific. This is frankly, Your Honor, no different than two of the cases that we submitted that were particularly interesting in terms of narrow, specific governing and being an exception to general, and that was, for example, the Seventh Circuit in 2013, Arrow-Brown versus Centerpoint Properties, where there was a provision that said the lessee was supposed to take care of the floors. It also said in another provision that the landlord was supposed to pay all damages. The floor was damaged, and the court rightly held, however, that it was the lessee's responsibility to take care of that floor because it was a narrow part of the property that was damaged. Otherwise, what you have is the part of the lease agreement that said that the floor was to be taken care of by the tenant is a nullity. It got swallowed up. It would have had no purpose, and that is exactly what happens here. That's the other policy of contract construction. Not only is a specific always rules over a general because, and it's deemed to be an exception, if you were to say that, oh well, you know, frankly, distribution means giving out, delivery, dispersing. They don't limit it to rents. They say it's basically anything this borrower owns. Then it would cover almost all of 1A, which has very targeted, specific defaults. Okay, I think we have this point. If you want to save a bit for your time, Your Honor. You still have a little bit. I'm not sure how much. Your Honor, I did want to. You just have about a minute, so. I did want to go back, if I may, just for one. I mean, including your rebuttal. You have about a minute. Oh, then I will sit down, Your Honor, and I will wait. Okay, fine. Thank you. Mr. Benz. May it please the court, Michael Benz for Appley Oryx Real Estate Capital, Inc. Your Honors, regarding the events of default, I just wanted to point out that Oryx has included a schematic chart in its appendix at page 237. It's referenced at page 18 of Oryx's brief, and I think with all the different names and entities here, it might be helpful to the court's consideration of this case. This was such a hopelessly complicated ownership. I mean, I looked at Exhibit C, you know, in some ways, hard to work up too much sympathy for anyone, but it's, anyhow, we are here to look at this contract and see what your best case is on whether events of default and cash trap events happened, and if so, whether you can get to the guarantor, which seems to be what the whole game is about. That's correct. I don't think RTP really exists. Our brief covers the events of default, and I will get back to those if I have time, but I wanted to take time to talk about the guarantee arguments first. Regarding the guarantee, what happened is that beginning in September 2010, RTP made distributions to its equity members. RTP made these distributions even though it was in default under the loan agreement. These distributions were basically dividends to RTP's equity members. I gather the net distributions during the period after the first event of default were 1.9 million dollars. That is correct. That's an awful lot less than the remaining indebtedness. Why isn't the remedy limited to 1.9 million dollars? Well, Your Honor, the Freed case gets into that because basically the parties made an agreement to allow for the recovery of the loan balance, and the Freed case in Illinois talked about the fact that the loss is not necessarily something that has to be related to the amount that has been agreed to. I understand. You could have a springing guarantee if the first locust of the year appeared after May 1, if that's what one contracted for, but it seems almost as hard to understand the springing of the whole guarantee as it does to understand this rat's nest worth of organizations, which seems entirely superfluous, designed for no reason other than to make it impossible for anybody to follow the transaction. Well, the bottom line is that the guarantee agreement specified that if it was triggered, if 1B was triggered, that the entire amount of the loan would be payable without regard to the amount of the loss of 1.9 million dollars, and that's been upheld by the court, the Illinois Appellate Court, so you know, and that's been accepted by courts throughout the country as well, which the Illinois court cited to. It sort of seems like a reckless guarantee on inheritance's part, then, if we take that seriously, because if it's really a five million dollar company or so, and it's guaranteeing up to 40 million dollars, give or take, I mean, I realize some of it gets recouped by various other. Unless, of course, the five million dollar minimum net worth rule is itself the effective guarantee, since it should arrange that it would have no more than five million in net worth, and given corporate limited liability, that's the amount it will pay. That's correct. I mean, ultimately, you know, there's a collectability issue with respect to inheritance, and I'm not sure, well, you may refer to it as collectability, but it may be that that's the real maximum amount of the guarantee, that that's the role this plays in this transaction. I think that that's one way to look at it, Your Honor, but reckless guarantee, I mean, something that inheritance signed up to, and it's an industry standard type of guarantee that this would spring into liability for the entire loan, so this is not... So inheritance begins as one of this, let's see, I'm trying to figure out the role of Lucas and Shoemake in inheritance. They basically, indirectly, are running its affairs as well. They were with ICG Real Estate Advisors, LLC, which was the manager of inheritance. Right, I'm just trying to be practical as opposed to corporate about it. So part of their structure, I think is what Judge Easterbrook is saying, is to assure that inheritance, in fact, only has the five million, even if it's technically liable for 30, it's not there, it's not there, and so you'll collect the five and be done with it, and it'll fold, it'll go into bankruptcy. That's correct, but the judgment will be for the higher amount, according to Illinois law. So this is relying all on this 1B9. Right, that's right. Which does seem to say that it's liability for all of the indebtedness and other obligations, unless Ms. Jacoby is right, and by the time you start talking about other obligations, maybe you're talking about losses and expenses, in which case you've got to reconcile all of these things. Well, paragraph 1B is, in our argument, an anti-dividend provision. What you don't want in this circumstance is dividends being paid out after an event of default. It is a major event, a major violation that bears a major monetary consequence. Something that is more general, if they paid out money that was outside of the ordinary course, that's a minor violation with a minor monetary consequence, and that's the difference between paragraph 1A and 1B. And that's how you're characterizing 1A, is minor events, losses, and expenses? On a relative scale, okay, attorney's fees and the definition of losses and expenses is not going to be a small number, but compared to 30 million dollars, it's minor, and so the things that you might do after a default under 1A are minor and they trigger a minor liability, whereas if you do something of a major variety under paragraph 1B, that's where you get yourself into real trouble. That's insolvency, that's fraud, and that is declaring a dividend and paying a dividend after default. I mean, that money belongs to the lender at that point. The money belongs to Oryx, which has a security interest in the rents, and the rents are an important part of the recovery of Oryx after an event of default, and when those monies are paid to equity ahead of the debt, that's a big problem, and that's what happened here. And that's why... Clawing back the 1.9 million compared to having the whole 30 million as a judgment are two quite different things, though. Clawing back the problem that that provision of the contract was designed to address. I understand, and yet we have definitions that deal with, you know, the entire amount of the debt under 1B. There are certainly different amounts that are in play here. So it certainly doesn't make it look much like a non-recourse arrangement. Well, it's a non-recourse, but you can forfeit it. That's what the Freed case says. If you do some things that you're not supposed to do, then you forfeit the non-recourse nature of the loan, and that's what happened here. And as I say, these are common provisions in the industry, and these kinds of cases have come up all throughout the country, but the Freed case here is controlling, albeit on somewhat different facts. It was important for Oryx to protect its collateral, the rents, after default, and to prevent that collateral from being paid out as dividends to the borrower's equity members. Now at page 39 of our brief, we cite to the Fidelity case, which Judge Posner decided and observed that in a non-recourse loan context, the rents are an important source of repayment after default. And on page 29 of our brief, we cite to Judge Easterbrook's observation in an article or a book that he wrote, that lenders include covenants in their loan agreements to deal with situations where the lender's interests conflict with those of equity holders. That's what we have here. The Freed case picks up on this very point at paragraph 31 of that decision. That case is at the back of our appendix and talks about the conflict between equity holders and lenders, and the lenders nailing down that conflict to make sure that money that is its collateral does not escape to equity holders. And so an anti-dividend provision makes absolute sense and the logic matches the distinction between paragraph 1A and paragraph 1B. Can we go back to events of default and cash trap events, because we don't get here if none of those things happened. And it seemed to me, well I mean my first question I'll just raise is the same as the one I asked Ms. Jacoby, whether we're finished as soon as we find one such event or whether we need to find several. Any basis for a cash trap event allows it to be triggered. So any event of default of the type that qualifies under the definition of cash trap event would permit the triggering of that trapping of cash. So I think you're right that she has to knock down every single one. So we have this lapse in the registration which winds up being cured eventually. We also have the fact that when Oryx first sends a notice to RTP, it doesn't rely on that as the reason for a problem. Instead it's an anticipatory breach argument and then there's a revised notice that beefs up the arguments I suppose to a degree. So what about this whole thing about whether Oryx gave RTP enough notice and opportunity to cure to proceed this way? Well the corrected notice came at the end of September and the cash was not trapped until October rent payment. So the notice came before the this is a notice and giving you an opportunity to cure. No, but the certain of the provisions of the loan agreement did not require notice and an opportunity to cure. There are defaults under 5.1.6A and 5.1.7B which are automatic if you change the management, if you amend your operating agreement. So this is the change from Shoemake and Lucas over to Bernard and that's correct. So those provisions are self-executing. They don't require notice and an opportunity to cure and again these are the you know this goes to the goals of trapping cash so that the money does not get away from the lender in favor of the equity holders. So what's the argument that that's a material change for this arrangement? Well again those provisions do not require any kind of materiality consideration because they are by definition, if you look at paragraph 7.1.A of the loan agreement, which is the default section, that section includes 5.1.6A and 5.1.7B and there's no materiality finding necessary with respect to those defaults. With respect to the other non-monetary defaults, if you look at the definition of cash trap event, the borrower ceded to Oryx the determination of what was material and non-material. Basically says as determined by the lender and that was something that Judge Koukouras applied when he made those determinations. If you look at his conclusion sentences you'll see the words as determined by the lender so this is something that he understood well in his decision. But you really don't have to get to these materiality issues, you don't have to get to the notice and the opportunity to cure for certain of these defaults because they are automatic and they were agreed to by the parties and you know once you put that mechanic in place it operates automatically. It's not something that you have a right to negotiate or ask a court to change. With respect to this general specific argument that Ms. Jacobi talked about and your Honor did as well, which one of these provisions, paragraph 1a or 1b is more specific. We've got a dividend provision in 1b little 9, don't pay dividends and 1a little 10 is any use of revenues after a default outside of the ordinary course. That could be lots of different things. It could be that you had a default and you decided after a default to put a tennis tennis course on the property, not likely, but or a swimming pool or it could be any kind of use of revenues after a default. But the dividend provision is specific and I would argue that that is the specific if there were a conflict at all, which in my judgment there is not a conflict, but that's the specific provision. If you 1b little 9 would fit within paragraph 1a little 10 but not vice versa, you know, a dividend would be a post default use of revenue outside of the ordinary course. But would every expenditure outside of the ordinary course after a default be a dividend? The answer is no. So there you see how one is more general and one is more specific and that I think responds to that particular argument that was made. They like the idea that the 1a little 10 provision is the more specific. Well why do they like it that way? Well it's smaller. They like the idea that the smaller liability is more specific but it does not follow, it's a non liability is therefore the more specific. At this point, your honors, I'd be glad to answer any questions that you have. Apparently there are no more questions, so thank you. We thank you. I think you have a minute, Mr. Jacoby. You have a minute and ten seconds. Your honor, I must address that immediately, this 1b 9, that somehow it is a dividend, anti-dividend provision. It doesn't say that. There is no defined term there. It doesn't use the word dividend. It doesn't say a distribution only to shareholders. It doesn't say, and the word distribution doesn't mean dividend, it means, and we have cited in our briefs, delivery, paying out, dispersing, giving away. It covers any type of giving away and it is not limited nor could it ever fit within 1a 10 because it includes assets. 110a doesn't. It includes cash. 110a only includes rents generated after an event of default. There is nothing that is specific about 9b. I know that counsel would like to read it that way. I know counsel would like to have defined it that way, but you just can't. It's not in common English language, which we must use. There were no provisions in here defining it any other way. In terms of the specifics, if you look at the whole, and when they say Freed governs, Freed does not govern. I'm very familiar with the Freed case. It just says that there can be springing guarantees, but as we all know, a guarantee, you have to look at the need to wrap up. Thank you, Your Honor. Only one other point. When you talk about Exhibit C, I would hope you had noted, and I'm sure you did, Exhibit C was blank when both Oryx and RTP entered into this loan. There was nothing with respect to those managers. Okay, thank you very much. Thanks to both counsel. We'll take the case under advice.